UNITED STATES of America,
Plaintiff–Appellee,

v.

ROCKFORD MEMORIAL CORPORA-
TION and SwedishAmerican
Corporation, Defendants–Appellants.

No. 89–1900.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1989.

Decided April 3, 1990.

Robert B. Nicholson, David Seidman, Department of Justice, Antitrust Div., Appellate Section, Richard S. Martin, Seymour H. Dussman, Nancy M. Goodman, Fred E. Haynes, Department of Justice, Antitrust Div., Washington, D.C., for U.S. plaintiff-appellee.

John C. McCarthy, Terry D. Anderson, and Scott C. Sullivan, Williams & McCarthy, Rockford, Ill., Thomas Campbell, Edward S. Weil, Gardner, Carton & Douglas, Chicago, Ill., for Rockford Memorial Corp. defendant-appellant.

Thomas Campbell, L. Edward Bryant, Edward S. Weil, Gardner, Carton & Douglas, Chicago, Ill., for all defendants; John C. McCarthy, Terry D. Anderson, Williams & McCarthy, Rockford, Ill., for defendant Rockford Memorial Corporation; Bradley T. Koch, Philip R. Frankfort, Holmstrom & Green, Rockford, Ill., for defendant Swedish-

American Corporation; Diane P. Wood, Chicago, Ill., of counsel.

William G. Kopit, Robert W. McCann, Epstein, Becker & Green, Washington, D.C., for Voluntary Hospitals of America, Inc. amicus curiae.

Before POSNER and FLAUM, Circuit Judges, and DUMBAULD, Senior District Judge.[*]

POSNER, Circuit Judge.

The United States brought suit under section 7 of the Clayton Act and section 1 of the Sherman Act (15 U.S.C. §§ 18, 1) to enjoin a merger of the two largest hospitals—both nonprofits—in Rockford, Illinois, a city of 140,000 people. The district judge held that the merger violated section 7, and issued the injunction; he did not reach the section 1 charge. 717 F.Supp. 1251.

The defendants appeal, arguing first that section 7 does not apply to a merger between nonprofit enterprises. Surprisingly, this is an issue of first impression at the appellate level, with the exception of an unpublished opinion by the Fourth Circuit, of which more later. Section 7 provides that "[1] no person ... shall acquire ... the whole or any part of the *stock or other share capital* and [2] no person *subject to the jurisdiction of the Federal Trade Commission* shall acquire the whole or any part of the *assets* of another person," where the effect may be substantially to lessen competition, or to tend to create a monopoly. (Emphasis added.) Illinois law forbids a nonprofit corporation to have, and these hospitals do not have, stock or share capital. Ill.Rev.Stat. ch. 32, ¶ 106.05. So the clause we have labeled [1] would seem not to apply. And, the defendants argue, the FTC has no jurisdiction over a nonprofit corporation—so that the merger is not covered by the clause referring to asset acquisitions, clause [2], either—because section 4 of the Federal Trade Commission Act confines the Commission's jurisdiction under the Act to a "company ... or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members." 15 U.S.C. § 44.

■ The first argument, knocking out clause [1], is strong. The second argument, however, in assuming that the reference in section 7 to "person[s] subject to the jurisdiction of the Federal Trade Commission" is to the Federal Trade Commission Act, overlooks the possibility that the reference is actually to the provision in the Clayton Act itself concerning the jurisdiction of the FTC—namely section 11, 15 U.S.C. § 21. Section 11 vests authority to enforce the prohibitions of the Clayton Act in five agencies. These are the Interstate Commerce Commission, with respect to the common carriers regulated by that Commission; the Federal Communications Commission, with respect to the common carriers regulated by it; ditto for the Civil Aeronautics Board (now defunct); the Federal Reserve Board, for banks; and, for everyone else, the FTC: "Authority to enforce compliance with sections 2, 3, 7, and 8 of this Act by the persons respectively subject thereto is hereby vested in ... the Federal Trade Commission where applicable to all other character of commerce." Section 11 goes on to prescribe the procedure to be followed by these commissions and boards that have been given jurisdiction to enforce the Act. The procedure is self-contained and does not depend on particular provisions in the agencies' organic statutes, so that when in 1950 Congress amended section 7 to broaden its reach, it amended section 11 as well. We believe that the force of the assets-acquisition provision in section 7 is, therefore, merely to exempt mergers in the regulated industries enumerated in section 11. Areeda & Turner, Antitrust Law ¶ 906, at p. 797 n. 2 (1989 Supp.). Those industries do not include the hospital industry. The Clayton Act evinces a purpose of limiting the Federal Trade Commission's jurisdiction vis-à-vis that of other federal agencies charged with enforcing the Act in the industries that they regulate, but it evinces no purpose of exempting nonprofit firms in industries with-

[*] Hon. Edward Dumbauld, of the Western District of Pennsylvania, sitting by designation.

in the domain that the Act bestows on the Commission ("all other character of commerce").

The government amazingly has failed to make this argument (thus waiving it), substituting an unnecessarily venturesome argument that the acquisition of control of a nonprofit corporation is the acquisition of that corporation's stock or share capital within the meaning of section 7 (and hence comes within clause [1]), even though a nonprofit corporation does not have any stock or share capital and could not under relevant state law. The government points out that in *United States v. Philadelphia National Bank*, 374 U.S. 321, 335–49, 83 S.Ct. 1715, 1726–33, 10 L.Ed.2d 915 (1963), the Supreme Court held that a bank merger was a stock acquisition for purposes of section 7, though in corporate law it is an asset acquisition. There was no indication, the Court pointed out, that Congress had by its references to the FTC in sections 7 and 11 intended to exempt mergers by regulated firms; and while the acquiring firm in a merger does not actually acquire the stock of the acquired firm—it acquires the assets, in exchange either for stock of the acquiring firm or, in the case of a consolidation (the actual transaction in that case), for new stock—the effect is the same. *Id.* at 336–38, 83 S.Ct. at 1726–27.

The approach to statutory interpretation that informs *Philadelphia National Bank* is controversial, but it is neither indefensible nor irrelevant to the interpretive question in the present case. The approach, premised on recognition that legislative draftsmanship is often a rushed and clumsy process, deficient in foresight, tries to carry out the purposes of the statute insofar as these can be inferred, even if the result is a wide departure from literal meaning. But whatever its merits, it is not an approach in vogue in the Supreme Court at the moment and we hesitate to push it further than it was pushed in *Philadelphia National Bank*. We would be pushing it further if we read the words "stock" and "share capital" in section 7 as if they were synonyms for "control" (which is what

would be acquired by this merger), although there are passages in the *Philadelphia Bank* opinion that can be quoted in support of the extension. E.g., *id.* at 338, 83 S.Ct. at 1727.

We are especially reluctant to test the elasticity of our interpretive powers without good reason, the only reason here being that the government overlooked a solid argument, based on section 11 of the Clayton Act, which would eliminate the loophole that the government rather desperately asks us to fill by a far-out interpretation of section 7. We decline the invitation, and conclude that *as the parties have framed the issues* the merger is not subject to section 7. The qualification is important, for we believe (contrary to *United States v. Carilion Health System*, 707 F.Supp. 840, 841 n. 1 (W.D.Va.), aff'd without opinion, 892 F.2d 1042 (4th Cir.1989)) that the merger *is* subject to section 7, once the reference in that section to the jurisdiction of the FTC is understood, as we think it should be understood, to refer to section 11 of the Clayton Act rather than to section 4 of the FTC Act.

The government has a fallback position, however: the merger violates section 1 of the Sherman Act, as charged alternatively in the complaint. Although the district judge did not find it necessary to reach the issue, we can do so, without impropriety, since the subordinate findings that the judge made demonstrate a section 1 violation. We can affirm a decision by a district court on an alternative ground that has not been waived, *Martinez v. United Automobile Workers*, 772 F.2d 348, 353 (7th Cir.1985); *LaSalle National Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1052 (7th Cir.1988), and this ground has not been; it has been briefed and argued by both sides.

We doubt whether there is a substantive difference today between the standard for judging the lawfulness of a merger challenged under section 1 of the Sherman Act and the standard for judging the same merger challenged under section 7 of the Clayton Act. It is true that the operative language of the two provisions is dif-

ferent and that some of the old decisions (old by antitrust standards anyway) speak as if that should make a difference. E.g., *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 323, 85 S.Ct. 1473, 1479, 14 L.Ed.2d 405 (1965); *United States v. Penn–Olin Chemical Co.*, 378 U.S. 158, 170–71, 84 S.Ct. 1710, 1716–17, 12 L.Ed.2d 775 (1964). A transaction violates section 1 of the Sherman Act if it restrains trade; it violates the Clayton Act if its effect may be substantially to lessen competition. But both statutory formulas require, and have received, judicial interpretation; and the interpretations have, after three quarters of a century, converged. 2 Areeda & Turner, Antitrust Law, ¶ 304 (1978); 4 *id.*, ¶ 906, at p. 22.

We must recall some history. The Clayton Act was passed in 1914 against a background of disappointment with the Supreme Court's interpretation of the Sherman Act. Although the Court had held railroad cartels and the oil and tobacco trusts illegal under that Act, language in the Court's opinions, particularly Chief Justice White's opinion in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), aroused anxiety that it was too difficult to prove a violation. The response of the draftsmen of the Clayton Act was to identify particular anticompetitive practices and forbid them upon a showing not that they would, but merely that they might, lessen competition substantially. Among these practices was the acquisition of the stock of a competitor; such acquisitions, particularly when secret, were thought to be among the methods that trusts used to acquire market dominance and intimidate rivals. *Brown Shoe Co. v. United States*, 370 U.S. 294, 314, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962).

Although the Clayton Act gave the Department of Justice jurisdiction concurrent with the Federal Trade Commission to enforce its provisions, 15 U.S.C. §§ 21, 25, only the FTC seemed interested in enforcing section 7 and its ability to do so against mergers as distinct from pure stock acquisitions was crippled by a series of decisions narrowly interpreting the Commission's powers under section 11. (The story is told in *United States v. Philadelphia National Bank, supra*, 374 U.S. at 338–40, 83 S.Ct. at 1727–28.) In addition, when the Department of Justice brought suit under section 1 of the Sherman Act against a substantial asset acquisition in *United States v. Columbia Steel Corp.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), it was rebuffed in an opinion widely regarded as imposing—once again—an undue burden on the antitrust plaintiff.

It was against this background that Congress in 1950 amended section 7 to plug the asset-acquisition loophole and by doing so to bring mergers and other asset acquisitions under the less demanding standard of the Clayton Act. *United States v. Philadelphia National Bank, supra*, 374 U.S. at 341–42, 83 S.Ct. at 1729–30. But it was less demanding only in relation to the interpretation of section 1 in *Columbia Steel*, and that interpretation was to change. In *United States v. First National Bank & Trust Co. of Lexington*, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), the Supreme Court invalidated under section 1 a merger which had joined two banks that between them had from 52 to 54 percent of the commercial banking business of their market and from 80 to 95 percent of the trust business. The ground was the elimination of competition between the merging firms, and implied—since every merger eliminates competition between the parties to the merger—that any very large horizontal merger violated the statute. There was still a gap between the statutory standards, for in the period in which *Lexington Bank* was decided the Supreme Court was holding mergers in single digits unlawful under section 7, a trend that culminated in *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). In recent years, however, a more moderate interpretation of section 7 has prevailed. As we noted recently in another (and very similar) hospital-merger case, *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir.1986), the current understanding of section 7 is that it forbids mergers that are likely to "hurt consumers, as by making it easier for the

firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."

A merger with such effects would also violate section 1. The defendants' argument that section 7 prevents *probable* restraints and section 1 *actual* ones is word play. Both statutes as currently understood prevent transactions likely to reduce competition substantially. Insofar as the *Lexington Bank* case implies that any large horizontal merger violates section 1 whether or not it is likely to reduce competition, it has been superseded by more recent decisions construing section 1, such as *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979), and *Cooperweld Corp. v. Independence Tube Co.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984), which reject the suggestion that horizontal mergers are unlawful without regard to competitive effects. In noting as if it supported their position that there can be no finding under these decisions of a Sherman Act violation without proof of market power, *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins. Inc.*, 784 F.2d 1325, 1334–37 (7th Cir.1986), the defendants fail to see that this requirement would be superfluous if the Act punished only actual restraints. It is *because* the transactions punished under the Sherman Act, like those punished under the Clayton Act, are ambiguous in their competitive consequences that the courts insist on proof of market power.

Even if we are wrong that the standards under section 1 of the Sherman Act and section 7 of the Clayton Act have converged, and even if we are right that the teaching of *Lexington Bank* that a large horizontal merger (we mean of course large relative to its market) violates section 1 has been superseded, and even if the consequence of all this is that the old *Columbia Steel* decision remains canonical for mergers challenged under section 1, the defendants are still in deep trouble. The Court in *Columbia Steel* thought that a merger which created a 24 percent firm was not anticompetitive in the unusual conditions of the industry, 334 U.S. at 529, 68

S.Ct. at 1125; here we have a far larger merger and, as we shall see, such unusual conditions as may be present in the hospital industry reinforce rather than undermine the inference naturally to be drawn from the defendants' combined market share.

 But all this is provided the district court's market definition is accepted. The "market" is the denominator of the fraction the numerator of which is the output of the defendants or some other select group of firms; the denominator is given by the output of the suppliers to which a group of customers can turn for their requirements of a particular product. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961). Market share is the fraction of that output that is controlled by a particular supplier or particular suppliers whose market power we wish to assess. The higher the aggregate market share of a small number of suppliers, the easier it is for them to increase price above the competitive level without losing so much business to other suppliers as to make the price increase unprofitable; this is the power we call market power.

The district judge estimated the combined market share of the parties to the merger (hospitals of roughly equal size—the two largest in Rockford) at between 64 and 72 percent, depending on whether beds, admissions, or patient days are used as the measure of output. And he estimated the combined market share of the three largest hospitals in Rockford after the merger at 90 percent. Three firms having 90 percent of the market can raise prices with relatively little fear that the fringe of competitors will be able to defeat the attempt by expanding their own output to serve customers of the three large firms. An example will show why. To take away 10 percent of the customers of the three large firms in our hypothetical case, thus reducing those firms' aggregate market share from 90 percent to 81 percent, the fringe firms would have to increase their own output by 90 percent (from 10 to 19 percent of the market). This would take a while, surely, and would force up their costs, perhaps steeply—the fact they are so

small suggests that they would incur sharply rising costs in trying almost to double their output, and that it is this prospect which keeps them small. So the three large firms could collude to raise price (within limits of course) above the competitive level without incurring the additional transaction costs and risk of exposure that would result from their trying to coordinate their actions with that of their small competitors.

■ This analysis, however, collapses if customers can turn to suppliers who (or products that) have been excluded from the market. The market defined by the district judge consists of the provision of inpatient services by acute-care hospitals in Rockford and its hinterland. The defendants point out correctly that a growing number of services provided by acute-care hospitals are also available from nonhospital providers. But the force of the point eludes us. If a firm has a monopoly of product X, the fact that it produces another product, Y, for which the firm faces competition is irrelevant to its monopoly unless the prices of X and Y are linked. For many services provided by acute-care hospitals, there is no competition from other sorts of provider. If you need a kidney transplant, or a mastectomy, or if you have a stroke or a heart attack or a gunshot wound, you will go (or be taken) to an acute-care hospital for inpatient treatment. The fact that for other services you have a choice between inpatient care at such a hospital and outpatient care elsewhere places no check on the prices of the services we have listed, for their prices are not linked to the prices of services that are not substitutes or complements. If you need your hip replaced, you can't decide to have chemotherapy instead because it's available on an outpatient basis at a lower price. Nor are the prices of hip replacement and chemotherapy linked. The defendants' counsel correctly noted that diet soft drinks sold to diabetics are not a relevant product market, but that is because the manufacturers cannot separate their diabetic customers from their other customers and charge the former a higher price. Hospitals can and do distinguish between the patient who wants a coronary bypass and the patient who wants a wart removed from his foot; these services are not in the same product market merely because they have a common provider. The defendants do not argue for the broader market on the basis of substitutability in supply—that is, the ability of a provider of outpatient services to switch to inpatient services should the price of the latter rise as a result of collusive pricing, making such services more profitable.

■ The more difficult issue is the geographical market. The defendants offered evidence, which the judge accepted, that their service area is a ten-county area of northern Illinois and southern Wisconsin centered on Rockford. Medicare records the address of all hospital patients, so it was possible to determine the zip codes from which the defendants draw their patients. The district judge noticed that 87 percent of the defendants' patients come from an area surrounding Rockford and consisting of the rest of Winnebago County (the county in which Rockford is located) and pieces of several other counties; the remaining patients are widely scattered. The defendants accept the area picked out by the district judge as a reasonable approximation of their service area (though not of the relevant market). There are four other acute-care hospitals in that area. Their output (as measured, we said, by beds, admissions, or patient days, all of which are highly correlated) plus that of the defendants is the market that the judge used to estimate the defendants' market share.

The defendants point out correctly that the hospitals in the defendants' service area may not exhaust the alternatives open to the residents of that area. Maybe a lot of people who live in Rockford, or if not in Rockford then at the edge of the Rockford hospitals' service area at the farthest possible distance from Rockford that is still within that area, use hospitals outside the area. Maybe—but the record shows that the six hospitals in the defendants' service area, plus a hospital in Beloit just north of the service area, account for 83 percent of the hospitalizations of residents of the service area, and that 90 percent of Rockford residents who are hospitalized are hospitalized in Rockford itself. For highly exotic

or highly elective hospital treatment, patients will sometimes travel long distances, of course. But for the most part hospital services are local. People want to be hospitalized near their families and homes, in hospitals in which their own—local—doctors have hospital privileges. There are good hospitals in Rockford, and they succeed in attracting most of the hospital patients not only from Rockford itself but from the surrounding area delineated by the district judge. The exclusion of the Beloit hospital from the market was not adequately explained, but apparently does not affect the figures materially.

It is always possible to take pot shots at a market definition (we have just taken one), and the defendants do so with vigor and panache. Their own proposal, however, is ridiculous—a ten-county area in which it is assumed (without any evidence and contrary to common sense) that Rockford residents, or third-party payors, will be searching out small, obscure hospitals in remote rural areas if the prices charged by the hospitals in Rockford rise above competitive levels. Forced to choose between two imperfect market definitions, the defendants' and the district judge's (the latter a considerable expansion of the government's tiny proposed market), and bound to review the judge's determination under the deferential "clearly erroneous" standard, we choose the less imperfect, the district judge's.

The defendants' immense shares in a reasonably defined market create a presumption of illegality. Of course many factors other than the number and size distribution of firms affect the propensity to collude, but here as in *Hospital Corporation of America*, a factually similar case, most of them strengthen rather than weaken the inference of market power from market shares. 807 F.2d at 1387–92. Regulatory limitations on entry into the hospital industry increase the propensity to collude by preventing (or at least delaying and increasing the cost of) entry by new competitors to take advantage of an increase in prices. And neither generally nor in this instance does the existence of regulation work an implied repeal of the antitrust laws. *National Gerimedical Hospi-*

*tal & Gerontology Center v. Blue Cross of Kansas City*, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1980). The excess capacity that is part of the motivation for the regulatory limitations is itself an incentive to collude, although excess capacity in the competitive fringe reduces the feasibility of collusion—but concerning *that* excess capacity there is no evidence in the record. The urgencies of medical care and the prevalence of third-party (insurance or governmental) payment no doubt dilute price sensitivity, but that this weakens—rather than strengthens—the importance of encouraging competition is far from obvious.

We would not repeat any more of what we said in *Hospital Corporation* but for the emphasis that the defendants place on their status as nonprofit corporations. This status, they argue, removes any ground for concern that they might seek to maximize profits through avoidance of price or service competition. If this is correct, the Supreme Court was wrong in *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984), to reject an implicit exemption of nonprofit enterprises from the antitrust laws. We are aware of no evidence—and the defendants present none, only argument—that nonprofit suppliers of goods or services are more likely to compete vigorously than profit-making suppliers. Most people do not like to compete, and will seek ways of avoiding competition by agreement tacit or explicit, depending of course on the costs of agreeing. The ideology of nonprofit enterprise is cooperative rather than competitive. If the managers of nonprofit enterprises are less likely to strain after that last penny of profit, they may be less prone to engage in profit-maximizing collusion but by the same token less prone to engage in profit-maximizing competition. *Hospital Corporation of America v. FTC, supra,* 807 F.2d at 1390–91.

The question cannot be resolved a priori, and once the government showed that the merger would create a firm having a market share approaching, perhaps exceeding, a common threshold of monopoly power—two-thirds (*United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d

Cir.1945) (L. Hand, J.))—it behooved the defendants to present evidence that the normal inference to be drawn from such a market share would mislead.

It is regrettable that antitrust cases are decided on the basis of theoretical guesses as to what particular market-structure characteristics portend for competition, but to place on the government an insuperable burden of proof is not the answer. We would like to see more effort put into studying the actual effect of concentration on price in the hospital industry as in other industries. If the government is right in these cases, then, other things being equal, hospital prices should be higher in markets with fewer hospitals. This is a studiable hypothesis, by modern methods of multivariate statistical analysis, and some studies have been conducted correlating prices and concentration in the hospital industry. Kopit & McCann, *Toward a Definitive Antitrust Standard for Nonprofit Hospital Mergers,* 13 Journal of Health Politics, Policy & Law 635, 645–46 and n. 30 (1988) (discussing studies); Blackstone & Fuhr, *Hospital Mergers and Antitrust: An Economic Analysis,* 14 *id.* at 383 (1989); Dranove, Shanley & Simon, *Is Health Care Competition Wasteful? No!* (U.Chi.Grad. Sch.Bus., March 1, 1990). Unfortunately, this literature is at an early and inconclusive stage, and the government is not required to await the maturation of the relevant scholarship in order to establish a prima facie case. Cf. *Allen v. Seidman,* 881 F.2d 375, 378–80 (7th Cir.1989). The principles of civil procedure do not require that the plaintiff make an airtight case, only that his case satisfy some minimum threshold of persuasiveness and be better than the defendant's case. The government showed large market shares in a plausibly defined market in an industry more prone than many to collusion. The defendants responded with conjectures about the motives of nonprofits, and other will o' the wisps, that the district judge was free to reject, and did. The judge's findings establish a violation of section 1 under the standards of *Columbia Steel,* and the judgment must therefore be affirmed without our needing to decide whether the district judge was correct in holding that section 7 does reach mergers between nonprofit corporations.

The defendants press upon us a recent, not-to-be published (and therefore nonprecedential) opinion by the Fourth Circuit, *United States v. Carilion Health System,* 892 F.2d 1042 (4th Cir.1989), affirming a decision in favor of the defendants in a hospital-merger case much like this one. 707 F.Supp. 840 (W.D.Va.1989). The discussion in the Fourth Circuit's opinion is brief, indeed perfunctory, consisting as it does very largely of a conclusion that the district court's findings were not clearly erroneous; in any event the court did not want its decision to have a precedential effect. As for the discussion by the district court in *Carilion,* we find it unpersuasive as well as inconsistent with our analysis in *Hospital Corporation of America*—a case cited by neither the district court nor the court of appeals in *Carilion.*

AFFIRMED.