In re the MARRIAGE OF Laura Lynn DENTON and Dannie Phillip Denton

Laura Lynn Denton, Petitioner–Appellant,

v.

Dannie Phillip Denton, Respondent–Respondent.

No. 26117.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 31, 2005.

Fred H. Thornton III, Sikeston, MO, for Appellant.

Jim S. Green, Sikeston, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Laura Denton ("Wife") appeals from a judgment which dissolved her marriage to Dannie Denton ("Husband"), divided the Dentons' marital property and awarded Wife $75 per month as child support for their only child, Jessica Denton ("Daughter"). Wife presents two points for decision. In Wife's first point, she contends the trial court erred in dividing the Dentons' marital property because Husband received the bulk of the marital assets. We deny this point because the Dentons' marital debts exceeded their assets, and Husband was allocated more of the debt than Wife. In Wife's second point, she contends the trial court erred in setting child support at $75 per month because the record does not contain a Form 14 worksheet or an explanation of how the court calculated the child support award. While Wife's second point has merit, the child support award must be reversed for a

more fundamental reason. At the time the dissolution judgment was entered, the juvenile division of the Circuit Court of Scott County, Missouri, was exercising jurisdiction over Daughter. Since the juvenile division had exclusive original jurisdiction over proceedings involving Daughter, the trial court lacked jurisdiction to enter an award for child support in this dissolution action. Therefore, the judgment is affirmed in part, reversed in part and remanded with instructions.

## I. Standard of Review

In Wife's appeal, she challenges the division of marital property and the child support award. In this court-tried case, our review is governed by Rule 84.13(d).[1] *Hall v. Hall,* 53 S.W.3d 214, 217 (Mo.App.2001). The judgment will be affirmed unless there is no substantial evidence to support the judgment, the judgment is against the weight of the evidence or the judgment erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *In re Marriage of Petersen,* 22 S.W.3d 760, 763 (Mo.App.2000).[2] A trial court is required to divide marital property in the exercise of its sound discretion. *In re Marriage of Baker,* 986 S.W.2d 950, 954 (Mo.App.1999). A trial court also possesses broad discretion in ordering child support. *MacDonald v. Minton,* 142 S.W.3d 247, 250 (Mo.App.2004). Thus, our task is to review the trial court's rulings on these two issues for compliance with *Murphy* and for an abuse of discretion. *In re Marriage of Reese,* 155 S.W.3d 862, 869 (Mo.App.2005). "An abuse of discretion occurs only if the decree is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration." *In re Marriage of Woodson,* 92 S.W.3d 780, 785 (Mo. banc 2003). On appeal, we defer to the trial court's credibility determinations and view the evidence and all permissible inferences from that evidence in the light most favorable to the judgment. *Mehra v. Mehra,* 819 S.W.2d 351, 353 (Mo. banc 1991); *Shields v. Shields,* 59 S.W.3d 658, 660 (Mo. App.2001). We ignore all contrary evidence. *Mehra,* 819 S.W.2d at 353.

## II. Facts and Procedural History

Husband and Wife were married in November 1985. Daughter, who was their only child, was born in May 1987. Husband and Wife separated in November 2001. Divorce proceedings were initiated in October 2002 by Wife. In her petition, she requested sole physical custody of Daughter, an award of child support and a division of the parties' marital property. Husband filed an answer to the petition and a cross-petition for dissolution of marriage. Husband requested that the parties share joint legal and physical custody of Daughter and that the marital property and debts be justly divided.

In January 2003, the juvenile court of Scott County, Missouri, assumed jurisdiction over Daughter for truancy and for refusing to obey her parents. Initially, she was placed in foster care, and she stayed with several different families. Daughter then became pregnant.

The dissolution action was tried on October 24, 2003. By that time, Daughter had given birth. With the permission of the juvenile division, Daughter and her infant son were residing in the home of Daugh-

---

1. All references to rules are to the Missouri Court Rules (2005).

2. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

ter's maternal grandmother. Wife, her brother and another child resided there as well. At trial, the court was made aware that the juvenile proceeding involving Daughter was still pending and she was under the juvenile division's jurisdiction.

As of the trial date, both Husband and Wife were unemployed. Husband had become an employee of the United States Postal Service in 1985, but he was suspended indefinitely without pay in July 2003 after criminal charges were filed against him.[3] Husband could not return to work for the Post Office unless he was acquitted of the charges, and he did not expect to do so. Wife's last job had been with the Sikeston Public School system, but she was fired in March 2001. She also had criminal charges filed against her after the parties separated, which culminated in her plea of guilty to the felony of child endangerment in March or April 2003.

The Dentons had marital debts totaling approximately $107,000.[4] Generally speaking, their marital property consisted of a house, automobiles, household goods, other personal belongings and Husband's federal civil service pension plan. To the extent the Dentons had any opinions as to the value of their possessions, they provided the trial court with that information via their trial testimony. In some instances, the Dentons agreed on an item's value. In other instances, the court was left with only one spouse's input on value due to the other spouse's lack of knowledge. On a few occasions, the Dentons' testimony as to the value of a particular piece of property (e.g., the house) was in dispute. Frank-

ly, the Dentons' testimony was equivocal and imprecise in many respects; however, both parties' testimony suffered from the same deficiencies. This freewheeling approach to valuation was utilized at trial in attempting to establish the value of Husband's pension plan. In Wife's case-in-chief, she called Husband as an adverse witness. Husband gave the following testimony concerning his pension:

Q. Okay. You have a retirement or pension plan through United States Postal Service; is that correct?

A. Yes, sir.

Q. And how much is that—how much is built into that at this time?

A. 21,000.

Q. And that's built up over your 15 years of working there during the marriage?

A. Yes, sir. I've also had to borrow against that, too.

Q. Okay. Is it 21,000 after what you borrowed against it, or is it 21,000 minus what you borrowed against it?

A. It's 21,000 when I had to borrow against it.

Husband testified that he borrowed the money to pay legal expenses for Wife's son from a prior marriage. Wife's attorney asked no further questions to ascertain when Husband borrowed against his pension plan or the total amount of such loans. Based upon the foregoing testimony, the trial court could have concluded that Husband's pension plan had been reduced by loans to a total value of only $21,000 as of

---

3. The charges were filed in January 2003. Husband was charged with endangering the welfare of a child, receiving stolen property and possession of a controlled substance with intent to distribute.

4. These debts included a mortgage balance of $44,500; a cellular telephone bill of $1,400; a loan from Wife's mother in the amount of $20,000; medical bills in the amount of $20,000; a loan from Husband's mother in the amount of $16,000; and a loan from Husband's brother in the amount of $5,000.

the date of trial. During Wife's direct examination, she testified that, based on statements she had seen, the pension plan had been worth $60,000 in 2002. At the conclusion of the trial, the court left the record open so Wife could present some additional information concerning Husband's pension plan.

Thereafter, Wife furnished the trial court with a quarterly statement from Husband's pension plan covering the period of June 1, 2003 through September 30, 2003. According to this document, the total account value as of June 1, 2003 was $71,154. Husband had worked long enough for the Post Office to become vested in the plan. As of September 30, 2003, the value of the pension plan was $58,859. Husband had borrowed $15,000 from the plan on August 4, 2003. Because the statement only reflected activity through September 30, 2003, the document did not establish the value of the pension plan as of the trial date or address whether Husband had borrowed additional sums from the plan between September 30, 2003 and the date of trial.

The trial court entered judgment on January 23, 2004. The only provisions of the judgment pertinent to this appeal are those involving the division of marital property and the child support award. We summarize below the trial court's rulings on these two issues.

First, as requested, the trial court divided the Dentons' marital property and allocated the marital debts between them. The judgment did not assign any values to the marital property awarded either party. Only a few of the debts had values assigned. Viewed in a light most favorable to the judgment and disregarding any contrary evidence, the trial court divided the marital property and allocated the marital debts as follows:

1. Wife was awarded an automobile, household goods and personal property worth approximately $6,850. She was required to pay marital debts in the amount of $21,400. These debts were comprised of the $1,400 cellular telephone bill and the $20,000 loan to Wife's mother. Thus, the amount of debt allocated to Wife exceeded the value of the marital assets awarded to her by $14,350.

2. The trial court awarded the Husband the following assets: (a) the house, which was worth $45,000; (b) one operational automobile, two non-operational automobiles, a small travel camper, household goods and other personal property worth approximately $2,750; and (c) a $21,000 pension plan. Husband was allocated marital debts in the amount of $85,500. These debts were comprised of the $44,500 home mortgage, $20,000 in medical bills, the $16,000 loan from Husband's mother and the $5,000 loan from Husband's brother. Thus, the amount of debt allocated to Husband exceeded the value of the marital assets awarded to him by $16,750.

Second, the trial court awarded Wife $75 per month as child support. At first, it appeared the trial court did not intend to make any ruling as to child support. On the second page of the judgment, the court specifically noted that "the issues of custody and support of the minor child are not taken up for the reason that the Court finds that the Juvenile Court of Scott County, Missouri has previously taken jurisdiction of the child and the child is currently under the jurisdiction of the Circuit Court, Juvenile Division." After making that pronouncement, however, the trial court placed the following provision in the decretal portion of the judgment:

B. The presumed child support amount as calculated pursuant to Section 452.340.(8) RSMo and Rule 88.01 M.R.C.P. is $75.00, and after consideration of all relevant factors pursuant to Section 452.340.(8) RSMo and Rule 88.01 M.R.C.P. said amount of $75.00 is just and appropriate that Respondent should pay to Petitioner the sum of $75.00 per month commencing November 1, 2003 and the 1st day of ·each month thereafter for the support and maintenance for said minor child.

The record on appeal did not contain a Form 14 worksheet or any explanation of how the trial court calculated $75.00 as the presumptively correct amount of child support. After entry of judgment, this appeal followed.

### III. Discussion and Decision

■ In Wife's first point, she challenges the manner in which the trial court divided the Dentons' marital property. The division of property in a dissolution proceeding is governed by § 452.330.[5] "This statute requires a trial court to follow a two-step procedure: (1) the court must first set aside to each spouse his or her nonmarital property; and (2) then divide the marital property and debts in such proportions as the court deems just."[6] *In re Marriage of Reese*, 155 S.W.3d 862, 869 (Mo.App.2005); *In re Marriage of Michel*, 142 S.W.3d 912, 920 (Mo.App.2004). The various factors which the trial court must consider in dividing the martial property are set out in § 452.330.1. *Reese*, 155 S.W.3d at 869–70. The division of marital property is left to the sound discretion of the trial court, and its decision will be upheld unless an abuse of discretion is shown. *Colabianchi v. Co-*labianchi, 646 S.W.2d 61, 64 (Mo. banc 1983); *Michel*, 142 S.W.3d at 920. An appellate court will only interfere with the division "if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion." *Nelson v. Nelson*, 25 S.W.3d 511, 516 (Mo.App. 2000). Marital property need not be divided equally; rather, the division must be fair and equitable under the circumstances of the case. *Wright v. Wright*, 1 S.W.3d 52, 59 (Mo.App.1999); *Klockow v. Klockow*, 979 S.W.2d 482, 487 (Mo.App.1998).

In seeking reversal of the property division, Wife argues that the trial court abused its discretion by awarding Husband "95% of the marital property." Wife's argument is flawed in two respects.

■ Wife derives the percentage of marital assets awarded to each party by assuming that she received property worth $6,850 while Husband received property worth $119,204. In computing the amount of assets awarded to Husband, however, Wife valued the pension plan at $71,154. Wife's calculation ignores the applicable standard of review. The general rule is that "the appropriate date for valuing marital property in a dissolution proceeding is the date of trial." *Wright*, 1 S.W.3d at 62; *Elrod v. Elrod*, 144 S.W.3d 373, 379 (Mo. App.2004). Husband and Wife bore an equal burden of presenting evidence as to the value of the pension plan. *Wright*, 1 S.W.3d at 57; *Elrod*, 144 S.W.3d at 379–80. The only witness who testified as to the value of the pension plan as of the date of trial was Husband. It is well-settled that the owner of property is competent to testify about its value in a dissolution proceeding, and the trial court was free to accept or reject Husband's testimony con-

---

5. All references to statutes are to RSMo (2000).

6. The first step of this process was irrelevant in the case at bar because neither Husband nor Wife had any nonmarital property.

cerning the plan's value. *Jarvis v. Jarvis*, 131 S.W.3d 894, 899–900 (Mo.App.2004). Wife's trial testimony only addressed the value of the plan at some unknown point in time during 2002. The plan statement furnished to the court after trial clearly refutes Wife's claim that the plan was worth $71,154 as of the date of trial. Furthermore, the statement provides no information as to whether Husband further depleted the plan assets through additional loans after September 30 and prior to October 24, 2003. Wife could have, but did not, elicit such information from Husband at trial. Thus, viewed in a light most favorable to the judgment and ignoring contrary evidence, the trial court could have found Husband's pension plan was only worth $21,000. That being the case, Wife was awarded marital assets worth $6,850; Husband was awarded marital assets worth $68,750.

█ Although even this division of marital assets seems unreasonably disparate, it is not, for a reason that highlights the second flaw in Wife's argument. In addition to dividing marital property, § 452.330.1 also authorizes a trial court to divide the marital debts. The trial court did so here. Wife was allocated marital debts in the amount of $21,400. Wife's indebtedness exceeded the value of the marital property she was awarded by $14,350. In contrast, Husband was allocated marital debts in the amount of $85,500. Husband's indebtedness exceeded the value of the marital property he was awarded by $16,750. Thus, the judgment rendered both Husband and Wife insolvent, and Husband was left responsible for $2,400 more of the marital debts than Wife.

In *Cope v. Cope*, 805 S.W.2d 303 (Mo. App.1991), the trial court in a dissolution action awarded the husband the entire interest in his pension fund. On appeal, the wife argued that the trial court erred in not allocating a portion of the pension fund to her. *Id.* at 304. On appeal, this Court affirmed the trial court's ruling because the court also allocated the bulk of the marital debts to the husband. The following observation from *Cope* is apropos here:

> In fixing the present value of and apportioning the husband's interest in the pension fund, the trial court faced a difficult task made more onerous by the limited amount of marital property and sizeable indebtedness of the parties. The trial court obviously determined that it should assign the payment of substantially all of the debts to the husband. In addition to the payment of general debts of $28,030, and the Escort debt of $8,260, the husband was ordered to pay his mother-in-law $15,665. Had the trial court not awarded the interest in the pension fund to the husband, as calculated above, his net award would have been a negative $32,514.

*Id.* at 307. In the case at bar, both Husband and Wife received negative net awards in the judgment, and Husband was required to pay $2,400 more of the marital debts than Wife. Under such trying circumstances, we believe the trial court's division of marital property and marital debts was fair and equitable. Accordingly, Wife's first point is denied.

█ In Wife's second point, she challenges the trial court's award of $75 per month as child support for Daughter. Wife contends the award was error because the record does not contain a Form 14 worksheet or any explanation of how the trial court calculated the child support. Certainly, there is ample authority to support Wife's contention. *See, e.g., Neal v. Neal,* 941 S.W.2d 501, 504 (Mo. banc 1997); *Marquez v. Marquez,* 136 S.W.3d 574, 581 (Mo.App.2004); *Tracy v. Tracy,* 961 S.W.2d 855, 864 (Mo.App.1998); *Woolridge*

*v. Woolridge,* 915 S.W.2d 372, 381–82 (Mo. App.1996). The error involved here, however, extends beyond simply failing to furnish record support for the child support calculation. For the reasons set forth below, we conclude that the trial court lacked jurisdiction to enter any child support award in this dissolution case.

It is undisputed that, when the dissolution action was tried, Daughter was subject to the jurisdiction of the juvenile division of the Circuit Court of Scott County, Missouri. The trial court clearly was aware of this fact, as evidenced by the initial statement in the judgment that the issues of custody and child support would not be adjudicated due to the pending juvenile proceeding. After so stating, the trial court inexplicably deviated from this course of action by setting child support at $75 per month and making the award retroactive to November 1, 2003. In doing so, the trial court misapplied the law.

Section 211.031.1 states, in pertinent part, as follows:

> Except as otherwise provided in this chapter, the juvenile court ... shall have exclusive original jurisdiction in proceedings: ... (2) Involving any child who may be a resident of or found within the county and who is alleged to be in need of care and treatment because: (a) The child while subject to compulsory school attendance is repeatedly and without justification absent from school; or (b) The child disobeys the reasonable and lawful directions of his or her parents or other custodian and is beyond their control....

The juvenile division of the Circuit Court of Scott County, Missouri, assumed jurisdiction over Daughter in January 2003 on these two grounds.

Once a juvenile court assumes jurisdiction over a child pursuant to § 211.031, the court is authorized to order a parent to contribute to the child's support. This authority is derived from § 211.241, which states, in pertinent part, as follows:

> 1. When the juvenile court finds a child to be within the purview of applicable provisions of section 211.031 it may in the same or subsequent proceedings, either on its own motion or upon the application of any person, institution or agency having the custody of such child, proceed to inquire into the ability of the parent of the child to support it or to contribute to its support. If the parent does not voluntarily appear for the proceeding, he shall be summoned in the same manner as in civil cases and the summons in the case may issue to any county of the state.

> 2. If the court finds that the parent is able to support the child or to contribute to its support, the court may enter an order requiring the parent to support the child or to contribute to its support and to pay the costs of collecting the judgment.

This remedial statute "permits a court to order a parent to support his or her child if the parent has the financial resources to provide the support." *In Interest of S.E.S.,* 845 S.W.2d 140, 142 (Mo.App. 1993); *see also Matter of Trapp,* 593 S.W.2d 193, 201 (Mo. banc 1980) (this statute authorizes a juvenile court to inquire into a parent's ability to make child support payments either in the initial custody proceeding or in subsequent proceedings).

In *Miller v. Russell,* 593 S.W.2d 598, 602 (Mo.App.1979), the juvenile division of the circuit court assumed jurisdiction over an abused child. The juvenile court issued an order requiring Miller, the putative father of the child, to appear before the court so it could determine, pursuant to the authority granted by § 211.241, Miller's financial responsibility to support the child. Miller sought a writ of prohibition, contending

that the court lacked the authority to determine paternity of the child in the juvenile proceeding. *Id.* at 600. Miller argued that paternity could only be established in a separate declaratory judgment proceeding. The Western District of this Court rejected Miller's argument because, once the juvenile division assumed jurisdiction over the child, the issues of child support—as well as the related issue of paternity—had to be exclusively adjudicated in that proceeding:

> In the subject case, initial jurisdiction of the child was acquired because the child was found to be in need of the protective services of the court.... This jurisdiction under the juvenile code is both original and exclusive. Section 211.031. Once the court's juvenile division has assumed jurisdiction over the child, Section 211.241 authorizes the court to summon the child's parent for inquiry as to financial resources and to order appropriate contribution to the child's support. Of necessity, this function may only be performed if the court by implication is also authorized under the statute to identify as a parent the person against whom the order for support is to be entered and enforced.
>
> . . . .
>
> It must, of course, be conceded that a declaratory judgment action could be pursued for the purpose of adjudicating the issue of paternity which respondent judge now intends to resolve.... At best, the jurisdiction of the circuit court in such a declaratory judgment suit, if filed, would be concurrent. Here, the juvenile division first validly assumed jurisdiction with respect to the child and thereafter proceeds to a conclusion of the matter to the exclusion of any other court of concurrent jurisdiction.

*Id.* at 602–03.

In so holding, the Western District relied upon *State ex rel. McCarty v. Kimberlin,* 508 S.W.2d 196 (Mo.App.1974). *McCarty* involved the issue of whether a trial court had the jurisdiction to adjudicate the issue of child custody in a habeas corpus proceeding after the juvenile division of the circuit court had previously decided that issue in a proceeding brought pursuant to § 211.031. The appellate court held that, although several courts initially may have concurrent jurisdiction to decide a particular issue (such as custody) involving a child, "the juvenile court having first validly assumed and found its jurisdiction ... may proceed to a completion of the matter, with continuing jurisdiction (§ 211.041), to the exclusion of any other court of concurrent jurisdiction." *Id.* at 199.

The results in *Miller* and *McCarty* were consistent with our Supreme Court's earlier decision in *State ex rel. Dubinsky v. Weinstein,* 413 S.W.2d 178 (Mo. banc 1967). In *Dubinsky,* Shirley Dubinsky had been awarded custody of her minor daughter in a divorce proceeding. Thereafter, a petition was filed in juvenile court alleging that the child was without proper care, custody and treatment. Dubinsky sought prohibition in the Supreme Court to prevent the juvenile court from exercising jurisdiction. She argued that, upon entry of the divorce decree, her daughter became a ward of the circuit court that adjudicated the divorce action; therefore, that court alone had continuing, exclusive jurisdiction over the child. Noting that "it is almost inevitable that conflicts of jurisdiction may occasionally develop[,]" the Supreme Court resolved the conflict by holding that "in a case properly coming within the provisions of § 211.031 the jurisdiction of the juvenile court supersedes and is paramount to the incidental jurisdiction which a divorce court may have over the custody of the child of the parties." *Id.* at 180–81. After reviewing numerous provisions of Chapter 211, the Court was convinced that "the general assembly, in

enacting the new juvenile act of 1957 and certain predecessor laws of a similar nature, recognized that other laws and procedures relating to the care and custody of children were not entirely sufficient and therefore intended that the juvenile court be given paramount jurisdiction over other courts in matters relating to the care and custody of children coming within the provisions of Chapter 211." *Id.* at 182.

In the case at bar, it is undisputed that Daughter was subject to the jurisdiction of the juvenile division when the Dentons' dissolution action was tried. That being the case, the juvenile division's jurisdiction was paramount and superseded the jurisdiction of any other court to decide the issues of Daughter's custody and support.[7] *See Ogle v. Blankenship,* 113 S.W.3d 290, 291–92 (Mo.App.2003).

For the reasons stated above, the trial court did not have jurisdiction to adjudicate the issues of child custody, visitation and child support. Accordingly, the pronouncements in the judgment concerning these three issues, being null and void, are reversed. *See Reed v. Reed,* 62 S.W.3d 708, 715 (Mo.App.2001). The case is remanded to the trial court with instructions to vacate those portions of the judgment addressing the issues of child custody, visitation and child support. In all other respects, the judgment of the trial court is affirmed.

PARRISH, P.J., and BARNEY, J., Concur.

---

7. In addition to the child support award, the decretal portion of the judgment also contains what appears to be a provisional ruling on the issues of child custody and visitation. This provisional ruling was to take effect only after the termination of the juvenile division's jurisdiction over Daughter. This attempt to adjudicate the issues of custody and visitation, however, was a nullity; the trial court's jurisdiction to do so had been pre-empted by the existence of the pending juvenile proceeding involving Daughter. *See Matter of J.F.K.,* 853 S.W.2d 932, 935 (Mo. banc 1993).