**ST. JOHN'S REGIONAL MEDICAL CENTER, a Missouri Non–Profit Corporation, Plaintiff–Respondent,**

v.

**FREEMAN HEALTH SYSTEM, a Missouri Non–Profit Corporation, Defendant–Appellant.**

No. 26953.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 11, 2007.

Motion for Rehearing and Transfer to Supreme Court Denied Oct. 1, 2007.

Application for Transfer Denied
Oct. 30, 2007.

Dwight Douglas, Neosho, MO, Thomas Campbell, Jake P. DeBoever, Chicago, IL, for Appellant.

Timothy M. Aylward, K. Christopher Jayaram, Kansas City, MO, Alexander B. Curchin, Joplin, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Freeman Health System (FHS) appeals from a judgment in a declaratory judgment action brought by St. John's Regional Medical Center (St. John's). The object of the action was to obtain a declaration determining how many board members FHS and St. John's were entitled to appoint to the Board of Directors of the Greater Joplin Area Emergency Medical Services System, Inc. (JEMS).[1] The trial court decided that FHS and St. John's were each entitled to appoint three of the six board members. We affirm.

## I. Factual and Procedural Background

In 1981, the City of Joplin, Missouri (City) had three hospitals: (1) St. John's; (2) Freeman Hospital (Freeman); and (3) Tri–State Osteopathic Hospital Association d/b/a Oak Hill Hospital (Tri–State). At that time, the City operated a municipal ambulance service. This operation caused the City to lose money and face potential exposure to legal liability. Therefore, the Joplin city manager and city attorney entered into negotiations with St. John's, Freeman and Tri–State to jointly take over operation of the ambulance service.

The three hospitals agreed to jointly operate the ambulance service through a new not-for-profit corporation known as JEMS. After the filing of JEMS' Articles of Incorporation (the Articles), a certificate

of incorporation was issued on October 21, 1981. The Articles contain the following provisions relevant to the issues presented on appeal:

### ARTICLE IV

Section 1. The business and affairs of this corporation shall be managed by a Board of Directors, the number and method of appointment of whom shall be fixed by the officially adopted By–Laws of the corporation.

### ARTICLE V

. . . .

Section 3. No part of the net earnings of the corporation shall enure to the benefit of, or be distributable to, its members, directors, officers and other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered.

Section 4. No substantial part of the activities of the corporation shall be the carrying on of propaganda or otherwise attempting to influence legislation, and the corporation shall not participate in or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office.

Section 5. Notwithstanding any other provisions of these Articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provisions of any future United States Internal Revenue law) or (b) by a corporation's contributions to which are deductible under Section

---

1. Eventually, JEMS came to be known as the Metropolitan Emergency Transportation Service. To avoid confusion, however, we will refer to this corporation as JEMS throughout our opinion because the relevant documents under review all use that nomenclature.

170(c)(2) of the Internal Revenue Code of 1954 (or the corresponding provisions of any future United States Internal Revenue law).

## ARTICLE VI

The membership of this corporation shall consist of the following hospitals located in Joplin, Missouri, each of which is a non-profit-corporation organized and existing pursuant to the laws of the State of Missouri:

St. John's Regional Medical Center, Joplin, Missouri

Freeman Hospital, Joplin, Missouri

Tri–State Osteopathic Hospital Association, a Not–For–Profit Corporation, d/b/a Oak Hill Hospital, Joplin, Missouri

. . . .

## ARTICLE VII

Section 1. The meetings of the corporate members shall be held annually, at such places as may be fixed from time to time by majority vote of the members. Section 2. The action of the corporate members shall be by majority vote of the Board of Directors, Board of Trustees or other governing Board of each of the member corporations, except as otherwise provided by law, Articles of Incorporation of this corporation and By-Laws of this corporation.

. . . .

## ARTICLE XI

Upon dissolution of this corporation, the Board of Directors shall, after paying or making provision for payment of all liabilities of the corporation, dispose of all of the assets of the corporation by transferring such assets to the then corporate members on a pro-rata basis in accordance with the contributions of said corporate members then being made for the operation of this corporation; provided, however, that at the time of said dissolution the corporate members are organized and operated exclusively for charitable, educational, religious or scientific purposes and shall at that time qualify as an exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1954 (or of the corresponding provisions of any future United States Internal Revenue law). In the event that one or more of the corporate members is not so qualified as an exempt organization under the Internal Revenue laws, then the assets shall be transferred to such an exempt corporation as the Board of Directors shall determine by majority vote.

The reference in Article XI to transferring assets to "the then corporate members" was included because it was possible that one of the three hospitals might withdraw from the arrangement, or Tri–State might go out of business because it was the weakest of the three members. If that occurred and JEMS dissolved, only the corporate member(s) remaining at that time would receive any of JEMS' assets. The limitation that only 501(c)(3) exempt organizations could receive such assets was included in the event that Tri–State was purchased by a for-profit entity like Humana or Columbia HCA.

In order to convert JEMS' aging ambulance service into an advanced life support system, each of the three hospitals agreed to make financial contributions to that corporation. Because St. John's was the largest of the three hospitals and would assume the greatest amount of financial risk, it initially wanted two-thirds representation on the JEMS Board of Directors. Freeman and Tri–State would not agree to majority control of the board by St. John's. They wanted each hospital to have equal representation on the board without being required to make an equal financial contribution to JEMS. Ultimately, St. John's

conceded the point and agreed to equal representation on the JEMS board for each hospital. Without that concession, the deal would have collapsed.

On a date not disclosed by the record, ʿBy–Laws for JEMS were adopted. In relevant part, the By–Laws state as follows:

### ARTICLE III
### MEMBESHIP [sic]

SECTION 1: The corporation shall have three (3) corporate members, [St. John's]; [Freeman]; and [Tri–State]; or the successor to any of said corporations.

SECTION 2: Each of the members agrees to maintain its membership for the minimum period of thirty-six (36) months following the date of [sic] the corporation shall first begin business. Any member may, by giving written notice to the others, not more than ninety (90) nor less than sixty (60) days prior to the end of the first business year or, within the same period of time, prior to the end of any subsequent business year, resign or withdraw as a member of the corporation, effective as of the last day of the business year in which said notice is given. A member so resigning and withdrawing shall not be entitled to the return of any contributions by way of capital or otherwise theretofore made by it to the corporation. Further, said member so resigning and withdrawing shall remain responsible for its proportionate share of the corporate debts and expenses incurred during the period of its membership.

SECTION 3: Voting. Each member shall be entitled to one (1) vote on each matter submitted to a vote of the members . . . .

SECTION 4: The actions of the corporate members shall be by majority vote of the governing board of each corporate member, except as provided by law, articles of incorporation or by-laws.

. . . .

### ARTICLE IV
### BOARD OF DIRECTORS

SECTION 1: Subject to the limitations of the Articles of Incorporation and the By–Laws of the corporation, the affairs of this corporation shall be managed by a Board of Directors consisting of six (6) persons. Each corporate member shall be entitled to appoint two (2) of the directors . . . .

. . . .

SECTION 3: The term of office of the first Board of Directors shall be staggered by a method of [sic] determined by the board so that at least two members' terms of office end each year. Equal representatin [sic] of corporate members shall be maintained. The corporate member shall appoint his representatives to fill expired terms. All Directors, other than the first board of Directors shall serve for a term of three years and until their successors are duly elected and qualified.

The "successor" provision in Article III, § 1 was added to the By–Laws because of a concern that Tri–State, being the weakest hospital, might be purchased by a for-profit corporation like Humana. If so, the purchasing corporation would take over Tri–States' place in operating JEMS. The provision in Article IV, § 3 concerning equal representation of the corporate members on the board was added because St. John's had conceded that issue to Freeman and Tri–State during negotiations. At no point during the drafting of the By–Laws did anyone consider the possibility that two of the existing corporate members might consolidate. Pursuant to the foregoing provisions of the By–Laws, each

hospital appointed two of the six JEMS board members.

In March 1982, an agreement to provide financial support for JEMS was executed by representatives of JEMS, St. John's, Freeman and Tri–State. Article IV of the agreement provided financing from the hospitals for a three-year pilot demonstration project. During the first 12 months of operation, the hospitals agreed to provide financial contributions according to the following percentages: St. John's, 55.5%; Freeman, 28.5%; and Tri–State, 16%.[2] After the first year, financial contributions were to be calculated based on the number of ambulance runs to and from each hospital per calendar year. Once the three-year pilot ended, the agreement continued on a month-to-month basis with any party having the right to withdraw upon 30 days notice. Article V stated that the agreement continued "until terminated by the parties hereto or until the date of withdrawal of the last hospital named herein." Article IX stated that "[t]his Agreement shall be binding on, enure to the benefit of and be enforceable by the parties hereto and their successors and assigns."

The foregoing agreement was superseded by one that became effective on January 1, 1985, containing very similar provisions. Article III provided up to $132,928 in financing from the hospitals for that calendar year according to the following percentages: St. John's, 52%; Freeman, 29%; and Tri–State, 19%. At the end of 1985, the agreement continued on a month-to-month basis with any party having the right to withdraw upon 30–days notice. Article IV stated that the agreement continued "until the expiration date provided for herein and thereafter until terminated by the parties hereto as herein provided or

until the date of withdrawal from this Agreement of the last hospital which is a party to this agreement." Article VIII stated that "[t]his Agreement shall be binding on, enure to the benefit of and be enforceable by, the parties hereto and their successors and assigns."

In 1994, Freeman and Tri–State sought to consolidate into a new corporation which is now known as FHS. The Federal Trade Commission (FTC) investigated the proposed transaction and opposed the consolidation. On March 1, 1995, Freeman and Tri–State filed Articles of Consolidation with the Missouri Secretary of State's office. The Articles provided that: (1) the separate corporate existence of Freeman and Tri–State would cease; (2) each of those entities would be consolidated into FHS; and (3) this new corporation would "succeed, without other transfer, to all the rights and property of each of the constituent corporations. . . ." That same day, the Missouri Secretary of State issued a certificate of consolidation.

The FTC filed suit in federal court seeking a preliminary injunction to block the consolidation. The district court denied that request, and the FTC appealed. On March 3, 1995, the Eighth Circuit Court of Appeals issued an order stating that Freeman and Tri–State "are enjoined from consolidation of their hospitals or assets from and after 9:00 a.m., February 28, 1995, and are specifically directed to immediately rescind any purported actions taken to merge defendant hospitals on March 1, 1995. . . ." During the pendency of the Eighth Circuit appeal, the operations of Freeman and Tri–State were kept entirely separate. The Eighth Circuit's injunction order remained in effect until November 1, 1995, when the district court's decision to

2. The agreement contained a provision that limited the maximum amount of each hospital's first year financial contribution as follows: St. John's, $61,255; Freeman, $31,456; and Tri–State, $17,660.

deny injunctive relief was affirmed. *Federal Trade Commission v. Freeman Hospital,* 69 F.3d 260, 273 (8th Cir.1995). Once that occurred, Freeman and Tri–State ceased to exist as separate entities and were replaced by the new FHS corporation. As a result, FHS and St. John's were the only two remaining corporate members of JEMS.

After the consolidation, FHS took the position that it was entitled to name four of the six directors to the JEMS board. FHS' position was based upon the premise that it held two memberships in JEMS because the membership previously held by Tri–State had been transferred to FHS via the consolidation. On January 16, 1996, St. John's CEO Robert Brueckner (Brueckner) sent a letter to FHS' CEO Kelby Krabbenhoft (Krabbenhoft). Brueckner proposed that control of the JEMS board be divided equally between St. John's and FHS because of the consolidation:

> Since the former Oak Hill Hospital no longer operates an emergency room or acute care services, a change to a 50–50 structure between St. John's and Freeman is appropriate and timely. I would suggest that we expeditiously pursue such a change in order to avoid any undue controversies and facilitate the continued smooth operation of JEMS' services. The clear intent of the parties in the creation of JEMS was the joint and cooperative efforts of not-for-profit corporations which are "equal partners" having equal representation. As a result of the merger, there will be two remaining corporate members of JEMS. To claim three members, two of which are identical, would be contrary to the intent of the JEMS incorporators as expressed in the Articles and By–Laws.

Krabbenhoft responded by letter two days later. He was willing to discuss possible corporate restructuring, but he opined that no provisions in JEMS' existing corporate documents allowed for a 50–50 board structure. Krabbenhoft described St. John's attempt to do so as a nullity and said FHS would not consent to such an arrangement.

FHS and St. John's remained at loggerheads over the issue for several years, but they initially attempted to resolve the matter without resort to litigation. In November 1999, however, St. John's filed a declaratory judgment lawsuit. The petition sought a declaration that St. John's and FHS were the only two remaining corporate members of JEMS and that each remaining member was entitled to appoint an equal number of directors to the JEMS board.

The case was tried to the court in December 2004. In March 2005, the trial court entered a judgment in St. John's favor. The court declared that FHS and St. John's were the only remaining members of JEMS and that each corporation could appoint three members to the board of directors. In the court's judgment, it made a factual finding that the consolidation between Tri–State and Freeman did not become effective until November 1, 1995, because of the litigation in federal court. The court also noted that, as of July 1, 1995, § 355.191 prohibited a member of a public benefit corporation from transferring a membership or any right arising therefrom.[3] After concluding that JEMS' Articles of Incorporation and By–Laws were ambiguous, the court construed those documents to prohibit one corporate member from holding two memberships. The court determined that its construction of the documents was consistent with the

---

3. All references to statutes are to RSMo (2000) unless otherwise specified.

intent of the original corporate members of JEMS. This appeal followed.

## II. Standard of Review

In this court-tried case, our review is governed by Rule 84.13(d).[4] *Mullin v. Silvercreek Condominium Owner's Ass'n, Inc.*, 195 S.W.3d 484, 489 (Mo.App.2006). We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[5] On appeal, we view the evidence and all permissible inferences from that evidence in the light most favorable to the judgment. *Mehra v. Mehra*, 819 S.W.2d 351, 353 (Mo. banc 1991). We ignore all contrary evidence. *In re Marriage of Denton*, 169 S.W.3d 604, 606 (Mo.App.2005). The trial court's judgment is presumed correct, and FHS has the burden of proving it erroneous. *Surrey Condominium Ass'n, Inc. v. Webb*, 163 S.W.3d 531, 535 (Mo.App.2005). An appellate court is primarily concerned with the correctness of the trial court's result, rather than the route taken by the trial court to reach that result. *Business Men's Assur. Co. of America v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). Therefore, we will affirm the trial court's judgment under any reasonable theory supported by the evidence, even if the reasons advanced by the trial court were wrong or insufficient. *Jackson v. Cannon*, 147 S.W.3d 168, 173 (Mo.App.2004); *Ewanchuk v. Mitchell*, 154 S.W.3d 476, 481 (Mo.App.2005).

## III. Discussion and Decision

On appeal, FHS advances three points of error: (1) the JEMS' Articles of Incorporation and By–Laws are not ambiguous and give FHS the right to appoint four of JEMS' six board members; (2) the trial court improperly considered parol evidence in deciding how to interpret JEMS' Articles and By–Laws; and (3) the trial court erred in deciding that FHS could not hold two memberships in JEMS via a consolidation with another member.

■ Because FHS' third point is dispositive, we will address it first. The lynchpin of FHS' argument is that Tri–State could transfer its membership in JEMS to FHS via a consolidation pursuant to § 355.215(4) RSMo (1986). The trial court concluded otherwise, and we agree with that conclusion.

Prior to July 1, 1995, Tri–State was an existing domestic corporation organized under the General Not–For–Profit Corporation law found in Chapter 355. *See generally* §§ 355.010–.530 RSMo (1986). Freeman and Tri–State filed their Articles of Consolidation on March 1, 1995. We will assume, without so deciding, that § 355.215(4) authorized Tri–State to transfer its JEMS' membership to FHS by virtue of the consolidation. The federal court injunction, however, prevented the attempted consolidation from being completed until November 1, 1995. During that time frame, Freeman and Tri–State kept their operations completely separate.

Before the injunction was lifted, the General Assembly substantially rewrote Missouri's not-for-profit corporation statutes found in Chapter 355. *See* 1994 Mo. Laws 854. As a consequence of that statutory revision, § 355.215 was repealed ef-

---

4. All references to rules are to Missouri Court Rules (2007).

5. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

fective July 1, 1995. On that date, § 355.881 became effective. In pertinent part, it states:

On July 1, 1995, each domestic corporation existing on that date that is or becomes subject to this chapter shall be designated as a public benefit or mutual benefit corporation as follows:

. . . .

(3) Any corporation which does not come within subdivision (1) or (2) of this section but which is recognized as exempt under section 501(c)(3) of the Internal Revenue Code, or any successor section, is a public benefit corporation;

(4) Any corporation which does not come within subdivision (1), (2) or (3) of this section, but which is organized for a public or charitable purpose and which upon dissolution must distribute its assets to a public benefit corporation, the United States, a state or a person which is recognized as exempt under section 501(c)(3) of the Internal Revenue Code, or any successor section, is a public benefit corporation; and

(5) Any corporation which does not come within subdivision (1), (2), (3) or (4) of this section is a mutual benefit corporation.

Sections 3 and 4 of JEMS's Articles of Incorporation demonstrate that it was organized as a tax exempt corporation pursuant to section 501(c)(3) of the Internal Revenue Code.[6] Additionally, Article XI of JEMS' Articles of Incorporation required that, upon dissolution, its assets could only be distributed to a corporation that qualified as tax exempt pursuant to 501(c)(3). Therefore, by operation of law, JEMS became a public benefit corporation on July 1, 1995. § 355.881(3)-(4). JEMS' new designation made Tri–State subject to another new statute just enacted by the General Assembly. In pertinent part, § 355.191 states that "[n]o member of a public benefit corporation may transfer a membership or any right arising therefrom." § 355.191.2. Tri–State's right to appoint directors to JEMS' board arose from its status as a corporate member of JEMS. As of July 1, 1995, Tri–State was prohibited by law from transferring that membership, or any rights arising from it, to anyone.

█ In sum, FHS could not acquire Tri–State's membership in JEMS via the consolidation. FHS was not created until November 1, 1995, when the consolidation was finally consummated. At that point, § 355.191 made it unlawful for Tri–State to transfer its membership in JEMS to FHS. It is axiomatic that a corporate by-law inconsistent with state law "is void and must give way to the superior authority of the statute." *Boatmen's First Nat'l Bank of West Plains v. Southern Missouri Dist. Council of the Assemblies of God,* 806 S.W.2d 706, 713 (Mo.App.1991). We believe the same principle must apply to articles of incorporation or consolidation. A provision therein that is inconsistent with a statute must give way to the statute's superior authority and is void. *See* § 355.045 RSMo (1986) (prohibiting a corporation's articles of incorporation from

---

**6.** In pertinent part, 26 U.S.C.A. § 501(c)(3)(West 2002) defines tax exempt organizations to include "[c]orporations ... organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."

containing any provisions inconsistent with law); § 355.096 (containing the same prohibition for articles of incorporation adopted after July 1, 1995). Consequently, the provision in the Articles of Consolidation stating that FHS would "succeed, without other transfer, to all the rights and property of each of the constituent corporations" could not, and did not, vest FHS with two memberships in JEMS in violation of § 355.191.2. FHS' assertion that it is entitled to appoint four of JEMS' six directors is entirely dependent on that premise, which is false for the reasons stated. Once the consolidation was consummated, Tri–State's corporate existence ceased and its membership in JEMS was extinguished. § 355.636(1). Consistent with the provision in the By–Laws that equal representation be maintained in the six-member board, the trial court correctly decided that St. John's and FHS each have the right to appoint three board members. Point III is denied.

In light of our disposition of Point III, FHS' other two points are moot. Based on the evidence presented and the controlling statutory framework, the trial court's judgment was correct. We must affirm a correct result, even if the court's reasons were wrong, incorrect or insufficient. *Barry, Inc. v. Falk*, 217 S.W.3d 317, 320 (Mo.App.2007); *Hart v. Hart*, 210 S.W.3d 480, 484 (Mo.App.2007). Assuming the trial court erred in finding an ambiguity in JEMS' Articles of Incorporation and By–Laws and in considering parol evidence about the parties' original intent, these errors were harmless and need not be addressed because they did not cause the result reached by the trial court to be incorrect. *See, e.g., Holbert v. Whitaker,* 87 S.W.3d 360, 364 (Mo.App.2002) (court's possible error in concluding that contracts were ambiguous did not matter because the court reached the correct result);

*Sharp v. Interstate Motor Freight System,* 442 S.W.2d 939, 947 (Mo. banc 1969) (because the circuit court reached the right result, it was immaterial whether the court erroneously considered incompetent evidence in reaching its decision).

The trial court's judgment is affirmed.

SHRUM, Sr.J., and GARRISON, J., Concur.