**In re The MARRIAGE OF Janice Louise LOONEY and Bobbie Ray Looney,**

**Janice Louise Looney, Petitioner–Respondent,**

v.

**Bobbie Ray Looney, Respondent–Appellant.**

**No. SD 29161.**

Missouri Court of Appeals, Southern District, Division One.

May 22, 2009.

James R. Sharp of Springfield, MO, for appellant.

M. Douglas Harpool of Springfield, MO, for respondent.

JEFFREY W. BATES, Judge.

The trial court's judgment dissolved the marriage of Bobbie Looney (Husband) and Janice Looney (Wife), divided the parties' marital property and debts, and awarded maintenance and attorney fees to Wife. Husband appealed. He contends the trial court erred in: granting maintenance to Wife (Point I); finding the entire balance of a savings account in Husband's name alone to be marital property (Point II); and awarding attorney's fees to Wife (Point III). Because Point II has merit, the judgment must be reversed. That ruling obviates the need to address Points I and III. The cause is remanded for further proceedings consistent with this opinion.

### I. Standard of Review

In this court-tried case, appellate review is governed by Rule 84.13(d). *In re Marriage of Denton*, 169 S.W.3d 604, 606 (Mo. App.2005).[1] This Court must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re Marriage of Dolence*, 231 S.W.3d 331, 333 (Mo.App.2007).

### II. Factual and Procedural Background

Wife filed a dissolution petition in May 2006, and the trial took place in October 2007. The parties presented the following evidence relevant to the dispositive issue on appeal.

Wayne Whitehead (Whitehead) was born near Springfield, Missouri, in August 1912. He grew up in this area and then moved to California, where he resided for many years. After he had a stroke which partially paralyzed the right side of his body, he returned to Missouri and purchased a home in Springfield.

Wife was Whitehead's second cousin. Wife's mother, Louise Sheppard (Sheppard), married Whitehead after he returned to Missouri. Their marriage, which took place in the mid–1990's, lasted about six months. Despite the divorce, Whitehead and Sheppard remained very close. They lived near each other, and Sheppard helped take care of Whitehead. He was

---

1. All references to rules are to Missouri Court Rules (2008). All references to statutes are to RSMo (2000).

invited to family dinners, holiday celebrations and birthday parties. Sheppard went to Whitehead's house to keep him company, bought groceries, cooked meals for him and gave him his medicine. Wife and her sister, Suzanne Scott (Scott), cleaned Whitehead's duplex for about a month and then stopped. Thereafter, Sheppard did the cleaning.

Husband and Wife got married in April 1998. At that time, Husband was 56 and worked at Hiland Dairy. Wife was 57 and worked at a flea market. They sold their separate residences for a net profit of approximately $31,500. These funds and a bank loan of approximately $116,000 were used to purchase a marital home. As of the date of trial, this house had an appraised value of $165,000.

After the couple's marriage, Husband and Whitehead became friends. In 1999 or 2000, Husband started helping care for Whitehead. He mowed and trimmed Whitehead's yard, worked in the garden, cooked for him or took him out to eat, did household repairs, took him to doctor's appointments, drove him to medical supply stores and helped him prepare his taxes.

When the flea market closed in 2001, Wife retired. At the end of 2002, Husband also retired from his job. Once Husband retired, he began spending a significant amount of time at Whitehead's house. Generally, Husband would arrive at Whitehead's home around 8:30 a.m. and stay until around noon three or four days per week. A few times, Husband was at Whitehead's house five or six days per week. Whitehead developed diabetic sores on one of his lower extremities and became wheelchair-dependent. Sometimes, Whitehead would call Husband in the middle of the night and ask for assistance. Husband would go to Whitehead's house to help him. Wife did not go along. At one point, Whitehead was in the hospital for over a month for treatment of a heart condition and diabetes. Husband spent a substantial amount of time at the hospital with Whitehead.

In November 2002, Whitehead paid off the loan on the parties' marital residence. At that time, the remaining balance was $105,487.36. Wife did not tell Scott about this occurrence. When she found out, she was very angry. The sisters stopped speaking to each other. To repair this familial rift, Wife decided to give Scott about half of the money the Looneys had received from Whitehead. In August 2003, Husband and Wife borrowed about $60,000 using the marital residence as collateral. Scott received $47,000 of those loan proceeds. Husband was not happy about giving any money to Scott because he felt she did not deserve it. When Whitehead found out what had happened, he was angry. Wife was later told by Sheppard that Whitehead did not want Wife or her sister to visit or clean his house any longer.

In April 2004, Whitehead asked Husband to take him to Signature Bank. Sheppard also went along. Whitehead had two certificates of deposit with him. Each certificate had a pay-on-death (POD) beneficiary designation. One named Sheppard as a beneficiary. The other certificate of deposit, with a face amount of $90,000, had been taken out in October 2001. This certificate listed Pete Rhodes, who was Whitehead's friend, as the POD beneficiary. Whitehead asked a bank employee to change the POD beneficiary designation on this certificate to "POD [Husband] (NO LDPS)."[2] Husband had not requested

---

**2.** The account terms stated that "LDPS means a class of unnamed persons who are the lineal descendants per stirpes of a beneficiary and who are to take upon surviving, in place of

the change, and this was the first time he learned of Whitehead's intentions.

Later, Wife learned from Sheppard that Husband had been named as the POD beneficiary. Wife did not believe Husband's name should have been placed on the certificate. Instead, Wife thought the money should go to Sheppard. At no time did Wife state that she believed her name should have been placed on the certificate.[3] Wife never discussed the issue with Whitehead.

During the marriage, Husband and Wife had a joint checking account at Guaranty Bank that was used by Wife. Husband and Wife also had a joint checking and joint savings account at Community Federal Credit Union (Community Federal). Husband and Wife began having marital problems in May 2005.

Whitehead died on March 21, 2006. Husband obtained a death certificate and presented it to Signature Bank so he could obtain the proceeds of the certificate. On April 28, 2006, the bank issued a $112,184.93 cashier's check to Husband as beneficiary of the certificate of deposit. By that point in time, Husband knew Wife intended to leave the marital home. Husband went to Community Federal and opened a new savings account in his name only. The savings account had an interest rate of 1.97%. Husband deposited the cashier's check into this new account.[4] At the same time this deposit was made, Husband also transferred $320.60 from the parties' joint checking account at Community Federal into Husband's new savings account. He withdrew about $8,300 to pay off the loan on a boat, which was a marital asset.

Husband and Wife separated on May 6, 2006. In July 2006, Husband transferred $5,826.12 from the parties' joint checking account at Community Federal into Husband's savings account. Between April 2006 and the time of trial, the balance in Husband's savings account was reduced to $95,843.36. Husband used the proceeds to pay the boat loan, deposition expenses, attorney's fees incurred by both parties and income taxes.

At trial, Husband claimed that the $112,184.93 proceeds of the certificate of deposit were his separate property. Wife claimed it was marital property. Wife testified that she assumed Whitehead intended to benefit her, even though the POD designation listed only Husband. This one contested asset was more valuable than any other except the marital home.

The trial court decided that the certificate of deposit proceeds were marital property. The court explained the proceeds were "initially deposited in a joint marital savings account" and "[t]here is no reason to believe that Mr. Whitehead intended to exclude his own relative from sharing in the proceeds of the certificate of deposit, nor that he intentionally placed any significance on using only [Husband's] name on the certificate of deposit as beneficiary since he was unaware of any mari-

---

and with the same priority as the named individual for whom they are indicated as substitutes."

**3.** At trial, Wife testified that she still believed the money should go to her mother. She admitted, however, that Sheppard received a duplex and certificates of deposit worth $250,000 from Whitehead when he died.

**4.** The bank statement showing the date and amount of the deposit into the savings account in Husband's name only was admitted as Wife's Exhibit 15. That documentary evidence was corroborated by Wife. She testified that Husband did not deposit the proceeds of the certificate into a joint account. Instead, Husband opened a separate account into which the Signature Bank check was deposited. Wife never had access to any account with this money in it.

tal discord between the parties and would have had ... reason to believe that as a married couple, both would benefit from the proceeds of the certificate of deposit." The court further found that "even if the proceeds of the certificate of deposit were found to be the separate marital property of [Husband], that he would have commingled the proceeds of the certificate of deposit when he deposited it into a marital savings account in which [Wife] had equal ownership rights."[5] Therefore, the court decided the remaining $95,843.36 balance in the savings account was marital property. The court noted that "the difference between it and the initial proceeds from the certificate of deposit were spent on reasonable and necessary marital expenses of the parties...." The court then divided the parties' marital assets and debts, granted Wife's request for maintenance and awarded her attorney's fees. This appeal followed.

### III. Discussion and Decision

In Point II, Husband contends the trial court's ruling that the money Husband received pursuant to the POD beneficiary designation was marital property is not supported by substantial evidence and was based upon a misapplication of the law. Because this point affects the entire appeal, it will be discussed first.

 "The identification of property as marital or separate is in the broad discretion of the trial court." *Winter v. Winter,* 167 S.W.3d 239, 243 (Mo.App.2005). Section 452.330.3 creates a presumption that all property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution is marital, regardless of whether title is held individually or jointly. § 452.330.3. This

presumption can be overcome, however, by showing that the property was acquired by one of the exceptions listed in § 452.330.2. *Id.; Winter,* 167 S.W.3d at 243. The applicable exception in this case is "[p]roperty acquired by gift, bequest, devise, or descent[.]" § 452.330.2(1). This exception must be proven by clear and convincing evidence, meaning "evidence which instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Marriage of Jennings,* 910 S.W.2d 760, 763 (Mo.App.1995); *Preston v. Preston,* 189 S.W.3d 685, 689 (Mo.App.2006). "Property which would otherwise be nonmarital property shall not become marital property solely because it may have become commingled with marital property." § 452.330.4. Once commingling occurs, the party claiming separate property has the burden of establishing that an identifiable portion of the funds can be traced to specific nonmarital assets. *Moore v. Moore,* 189 S.W.3d 627, 637–38 (Mo.App.2006); *Stidham v. Stidham,* 136 S.W.3d 74, 82 (Mo.App.2004). Further, in classifying the property as marital or nonmarital, Missouri courts apply the "source of funds" rule. *Hoffmann v. Hoffmann,* 676 S.W.2d 817, 824 (Mo. banc 1984); *In re Marriage of Altergott,* 259 S.W.3d 608, 616 (Mo.App.2008); *see Columbo v. Brunkhorst,* 217 S.W.3d 333, 334–35 (Mo.App. 2007); *Preston,* 189 S.W.3d at 690; *Thomas v. Thomas,* 196 S.W.3d 57, 62 (Mo.App. 2005).

 Nonmarital property "may lose its character as such if there is evidence of an intent to contribute the property to the marriage." *Dolence,* 231 S.W.3d at 338.

---

5. The court noted that the April 2006 deposit of $320.60 and the July 2006 deposit of $5,826.12 were marital property, regardless of whether the other proceeds in Husband's savings account were his separate property.

Under the theory of transmutation, an item of nonmarital property can be converted into marital property by gift or a spouse's express or implied agreement. *Id.* For example, when nonmarital property is placed in the joint savings account in the names of both spouses, a rebuttable presumption is created that the property became marital property. *Holsman v. Holsman,* 49 S.W.3d 795, 798–99 (Mo.App. 2001). This presumption is rebutted upon a showing by substantial evidence that the transfer was not intended as a gift. *Johannsen v. McClain,* 235 S.W.3d 86, 88 (Mo.App.2007).

Husband contends that he presented clear and convincing evidence proving the money Whitehead gave to Husband via the POD beneficiary designation was a gift to him alone and as such, was his nonmarital property pursuant to § 452.330.2(1). Husband further contends that he maintained the nonmarital status of the proceeds by depositing the money into an account in his name only. Husband concedes that he deposited marital funds into the savings account in the amounts of $320.60 and $5,826.12, totaling $6,146.72, but he argues that this commingling did not convert the entire account into marital property. Relying upon the source of funds rule, Husband contends that most of the remaining balance of the savings account should be awarded to him as his nonmarital property. This Court agrees.

 "If an account is signified as payable on death, when the account holder dies, 'the account shall become the property of the person named as the "pay on death" person.'" *In re Estate of Robertson,* 60 S.W.3d 686, 690 (Mo.App.2001); *see* § 369.186.2. When property is acquired by bequest, devise or descent, merely proving receipt of title via that statutory mode of transfer is sufficient to meet a party's burden of proof that the property is nonmarital in nature. *See Winter v. Winter,* 167 S.W.3d 239, 243 (Mo.App. 2005). In this Court's view, a statutory nonprobate transfer should be treated in the same way. It is undisputed that Husband acquired the proceeds from Whitehead's certificate of deposit via a statutory POD beneficiary designation. By law, that money became Husband's property upon Whitehead's death. This immediate transfer of title upon death makes a POD beneficiary designation the functional equivalent of a transfer of title by bequest, devise or descent. Thus, Husband presented clear and convincing evidence proving that those proceeds were his separate property.

The trial court's contrary ruling does not withstand scrutiny. First, the trial court's finding that there was no reason to believe Whitehead intended to exclude Wife from sharing in the proceeds of the certificate lacked any evidentiary support. It is undisputed that Wife was not named as a POD beneficiary. When she learned this, she did not claim that she should have been one of the named beneficiaries. Instead, she said that Sheppard should get the money. That continued to be Wife's position at trial. There was evidence that Whitehead was unhappy about Wife's decision to share the initial gift money with Scott. Wife admitted that, before Whitehead's death, he stated that he did not want Wife or her sister to visit him any longer. Wife's testimony that she assumed Whitehead intended to benefit her had no evidentiary value. *See In re Marriage of Stamatiou,* 798 S.W.2d 737, 741– 42 (Mo.App.1990). In addition, the court's finding that Whitehead did not understand the significance of the POD designation is based on speculation. There was no evidence to that effect, and it was undisputed that Whitehead had used the POD beneficiary designation on several other occasions. The court's statement that White-

head was unaware of any marital discord when he made the POD designation is a red herring because, in April 2004, the couple was not having marital difficulties. By Wife's own admission, those troubles first started in May 2005. Finally, the court's statement that Whitehead believed both Husband and Wife would benefit from the proceeds of the certificate is speculative and is based upon the premise that Whitehead could have permissibly intended a result contrary to the plain language of § 369.186.2 when he made Husband the sole POD beneficiary. To that extent, the court's ruling was a misapplication of the law.

■■■■■■ The court's finding that Husband initially deposited the proceeds of the certificate into a joint marital savings account is not supported by the evidence. Both Husband and Wife testified that the money was deposited into a new account bearing only Husband's name. The documentary exhibits corroborate that testimony.[6] Husband's admitted commingling of some marital funds with other money in the savings account did not convert the entire account into marital property. § 452.330.4; *Goodwin v. Goodwin*, 263

S.W.3d 703, 706 (Mo.App.2008) (commingling alone is "statutorily insufficient to transmute the property"). "A commingling of nonmarital and marital property will not transmute nonmarital property into marital property unless the owner intended to convert the nonmarital property to marital property." *Kinsey–Geujen v. Geujen*, 984 S.W.2d 577, 579 (Mo.App. 1999); *see In re Marriage of Altergott*, 259 S.W.3d 608, 617 (Mo.App.2008). Based upon the evidence presented, the only proceeds that Husband intended to convert into marital property were his expenditures to pay off the boat loan, deposition expenses, attorney's fees and income taxes.

■■■■ Point II is granted. Because the savings account (which earned a small amount of interest) included both marital and nonmarital funds, the source of funds rule must be used to determine the parties' respective interests in the Community Federal savings account. Applying the source of funds rule to the remaining $95,843.36 account balance as of the time of trial, the marital portion is $4,974.27; Husband's nonmarital portion is $90,869.09.[7]

6. At the conclusion of the trial, the court inquired of Husband whether he removed Wife's name from the Community Federal savings account before the proceeds were deposited. Husband answered that he did not remember. We note that this question hypothesized the existence of a fact (i.e., that the money was deposited in an existing account instead of a new account) that was contrary to prior testimony given by both Wife and Husband and the undisputed documentary evidence from the bank. In addition, all Husband stated was that he could not remember. Such testimony proves nothing. *See, e.g., State ex rel. and to Use of Williams v. Feld Chevrolet, Inc.*, 403 S.W.2d 672, 682–84 (Mo.App.1966) (a witness' testimony that he can't remember is no evidence at all); *Haire v. Stagner*, 356 S.W.2d 305, 310–11 (Mo.App. 1962) (same holding); *Inman's Adm'x v. Unit-*

ed *Rys. Co. of St. Louis*, 157 Mo.App. 171, 137 S.W. 3, 4 (1911) (same holding).

7. The source-of-funds formula was recently fully outlined by this Court in *In re Marriage of Altergott*, 259 S.W.3d 608, 619–20 (Mo.App. 2008) (used to determine the value of marital property when "acquired"). There, the percentages of marital and nonmarital contributions to total contributions were applied to determine the parties' respective interests in a home's equity. *Id.* This rule also has been applied to various types of accounts. *See, e.g., Thomas v. Thomas*, 196 S.W.3d 57, 62 (Mo. App.2005) (applying the source of funds rule to a savings account); *Columbo v. Brunkhorst*, 217 S.W.3d 333, 334–35 (Mo.App.2007) (remanding the case to apply the rule to retirement accounts); *Preston v. Preston*, 189 S.W.3d 685, 690–91 (Mo.App.2006) (remand-

■ "The erroneous characterization of property requires reversal of the order dividing marital property if the error materially impacts the overall distribution of the marital property." *Halupa v. Halupa,* 943 S.W.2d 272, 278 (Mo.App.1997); *see Thomas v. Thomas,* 196 S.W.3d 57, 64 (Mo.App.2005). This Court concludes the error is substantial and materially impacts the overall distribution of the marital property, as well as the grant of maintenance to Wife and her attorney's fee award. Accordingly, it is unnecessary to address the issues presented in Husband's first and third points.

Those portions of the judgment dividing the parties' property, granting maintenance to Wife and awarding her attorney's fees are reversed. The cause is remanded for further proceedings consistent with this opinion.

BARNEY, J., and SCOTT, P.J., Concur.

ing the case to apply the rule to bank accounts). Our calculation is set out below:
Total deposits: $6,146.72 + $112.184.93 = $118,331.65
Percentage marital/total contributions: $6,146.72 /$118,331.65 = 5.19%

Marital portion of remaining balance:
5.19% × $95,843.36 = $4,974.27
Non-marital portion of remaining balance:
94.81% × $95,843.36 = $90,869.09